**UNITED STATES of America,
Plaintiff,**

v.

**Francisco RODRIGUEZ, Defendant.**

**Case No. SACR 05–107 JVS.**

United States District Court,
C.D. California.

Jan. 11, 2013.

Andrew D. Stolper, Gregory W. Staples, Ivy A. Wang, AUSA–Office of U.S. Attorney, Criminal Division, Santa Ana, CA, for Plaintiff.

Craig Wilke, Law Office of Craig Wilke, Fullerton, CA, Cuauhtemoc Ortega, Federal Public Defenders Office, Santa Ana, CA, Davina T. Chen, Sean K. Kennedy, Federal Public Defenders Office, Los Angeles, CA, for Defendant.

## ORDER RE: MOTION TO DISMISS INDICTMENT OR GRANT A NEW TRIAL & ALTERNATIVE MOTION FOR DISCOVERY

JAMES V. SELNA, District Judge.

Defendant Francisco Rodriguez ("Rodriguez") moves the Court to dismiss the indictment or grant a new trial pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A) and 28 U.S.C. § 1867(a). (Motion, Docket No. 1190.) The United States ("the Government") timely opposed. (Government Opposition, Docket No. 1212.) Alternatively, Rodriguez moves to compel the Clerk of the Court for the United States District Court for the Central District of California ("CDCA"), Terry Nafisi ("the Clerk"), to produce additional discovery relating to the adoption and management of the Central District's Jury Selection Plan. (Motion, Docket No. 1190.) The Clerk timely opposed. (Clerk Opposition, Docket No. 1199.) Rodriguez timely replied. (Reply, Docket No. 1233.) For the following reasons, the Court **DENIES** the motions.

## I. BACKGROUND

### A. Procedural Background

This is a criminal prosecution for alleged conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and conspiracy to violate the Violent Crimes in Aid of Racketeering Statute ("VICAR"), 18 U.S.C. § 1959(a)(5). The October 2004

Grand Jury for the Southern Division of CDCA[1] indicted Rodriguez on May 18, 2005. (Indictment, Docket No. 1.) The third trial in the matter commenced on August 10, 2011, and the petit jury found Rodriguez guilty.[2] (Jury Verdict, Docket No. 1136.)

Rodriguez first indicated his intent to challenge the petit jury venire orally on August 12, 2011. (Reporter's Transcript (8/12/11), Docket No. 1214, at 23–24.) The Court informed Rodriguez that he must file a written motion and suggested waiting until additional individuals were summoned as jurors the next week. (*Id.* at 24.) On August 22, 2011, Rodriguez filed his initial motion challenging the petit jury venire. (Motion to Strike Venire, Stay Proceedings, and Order Discovery of Jury Information, Docket No. 1073.) In response, the Government argued, *inter alia,* that Rodriguez's motion was untimely under 28 U.S.C. § 1867(a).[3] The Court disagreed. It reasoned that "the circumstance[s] which brought into play Rodriguez'[s] duty of diligence were the results of the questionnaires for the current trial and the availability of 2010 Census data," so "Rodriguez acted diligently and within the time requirements of Section 1867(a)."[4] (Order re: Motion to Strike Venire and Other Relief, Docket No. 1080, at 7.)

The Court never addressed the timeliness of the challenge to the grand jury composition. During a hearing on August 26, 2011, the Government noted that "the grand jury was selected in 2004" and "[t]here is no record of anything relating to that prima facie case or otherwise," and asked if the Court is still "leaving that open." (Reporter's Transcript (8/26/11), Docket No. 1088, at 39.) The Court responded, "If we are going to talk about one, we might as well talk about both," and suggested seeking out any available data. (*Id.*)

Rodriguez moves to dismiss the indictment, for a new trial, or for additional discovery. He argues that by adopting and maintaining a jury selection plan that systematically underrepresents Hispanics on grand and petit juries, the Southern Division has violated his rights under the Jury Selection and Service Act of 1963 ("JSSA"), 28 U.S.C. §§ 1861–78, and the Fifth and Sixth Amendments.[5] (*See gen-*

1. The Southern Division consists of Orange County, California. 28 U.S.C. § 84(c).

2. Rodriguez was first convicted in 2007, but the Ninth Circuit reversed for error in the jury instructions. *United States v. Rodriguez,* 359 Fed.Appx. 833 (9th Cir.2009). The second trial commenced in April 2011 and ended in a mistrial because of a deadlocked jury. Sentencing is set for after the resolution of this jury pool challenge. (Status Conference, Docket No. 1141.)

3. 28 U.S.C. § 1867(a) provides:
 In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefore, whichever is earlier, the defendant may move to dismiss the indict-

ment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

4. The Court's August 26, 2011 Order states that "voir dire commenced with administering of questionnaires for the third trial." (Docket No. 1080, at 6.)

5. In the Reply, Rodriguez concedes the fair cross section challenge to the petit jury in light of *United States v. Hernandez–Estrada,* 704 F.3d 1015 (9th Cir.2012) (holding 6.2% absolute disparity between Hispanic representation in jury pool and age-eligible citizen population insufficient for prima facie fair cross section claim). Rodriguez admits his disparity calculation shows at most a 4.8% absolute disparity. (Reply, at 11–12.)

*erally* Motion.) The following factual summary details the available, relevant data on the Southern Division's Hispanic population and Jury Selection Plan.

### B. Population Data [6]

1. *U.S. Census Bureau Data*

#### Table 1: Citizenship & Voter Registration Data—California [7]

| Year | % Citizens Registered (18+) | % Non–Hispanic White Citizens Registered | % Hispanic Citizens Registered |
|------|------|------|------|
| 2000 | 65.84% | 70.93% | 55.00% |
| 2004 | 68.59% | 76.22% | 55.38% |
| 2008 | 68.23% | 72.90% | 62.83% |
| 2010 | 60.90% | 68.39% | 52.01% |

#### Table 2: Hispanic Population Data—Orange County [8]

| Year | Hispanics in General Population (18+) | % Hispanic | % Hispanic Citizens |
|------|------|------|------|
| 2000 | 549,509 | 26.4% | 15.54% (253,565 Persons) [9] |
| 2010 | 669,206 | 29.4% [10] | N/A |

2. *ACS: Age–Eligible Citizens by Ethnicity in Orange County*

#### Table 3: Citizenship & Ethnicity Status—Orange County

| Year | Population (18+) | Hispanic | % Population —Hispanic | Citizens (18+) | Hispanic Citizens | % Citizens —Hispanic |
|------|------|------|------|------|------|------|
| 2005 [11] | 2,144,727 | 602,199 | 28.01% | 1,706,257 | 305,465 | 17.90% |

6. The Court takes judicial notice of the population and citizenship data detailed herein. *See* Fed.R.Evid. 201(b); *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir.1996) (taking judicial notice of census documents because they satisfy requirements of Rule 201(b)).

7. U.S. Census Bureau, Tables 4a & 4b–Reported Voting and Registration of the Total Voting–Age Population, by Sex, Race, and Hispanic Origin, for States: November 2000–2010, Declaration of Craig Wilke ("Wilke Decl.") Exs. D–G, Docket No. 1190–1.

8. U.S. Census Bureau, Census 2000 & Census 2010 Redistricting Data–Orange County, Wilke Decl. Exs. H, I.

9. U.S. Census Bureau, Table 3: Hispanic or Latino Citizen Population–Orange County: 2000, Declaration of James Wagstaffe ("Wagstaffe Decl.") Ex. E, Docket No. 1192.

10. The American Community Survey ("ACS") is responsible for collecting citizenship data as of 2010. (*See* How the ACS Improves Census Statistics, Wagstaffe Decl. Ex. F.) The figure above slightly differs from ACS data showing that in 2010, Hispanics constituted 29.53% of Orange County's eighteen-and-over population and 21.01% of the eighteen-and-over citizen population. (*See* ACS, 2010 Sex by Age by Citizenship Status, Wilke Decl. Ex. N.)

11. ACS, 2005 Sex by Age by Citizenship Status (Hispanic or Latino), Declaration of Andrew Stolper ("Stolper Decl.") Ex. A, Docket No. 1212–1. There is no publicly available ACS data for Hispanic representation prior to

| 2007 [12] | 2,230,800 | 640,658 | 28.72% | 1,777,750 | 326,940 | 18.39% |
|---|---|---|---|---|---|---|
| 2008 | 2,245,108 | 654,045 | 29.13% | 1,799,668 | 345,701 | 19.21% |
| 2009 | 2,271,237 | 671,359 | 29.56% | 1,833,803 | 379,091 | 20.67% |
| 2010 | 2,280,716 | 673,441 | 29.53% | 1,863,822 | 391,542 | 21.01% |
| 2011 | 2,318,625 | 693,633 | 29.92% | 1,891,999 | 404,433 | 21.38% |

■ According to the Clerk, in Orange County, there were 1,554,792 registered voters in 2009, and 1,589,950 registered voters in 2010. (Terry Nafisi, Memorandum re: Status of Jury Representation Issue, Wilke Decl. Ex. U, at 1.) Thus, 84.79% of eighteen-and-over citizens in Orange County were registered in 2009, and 85.31% of eighteen-and-over citizens were registered in 2010.

## C. The Jury Selection Plan and the Jury Pool in Southern Division

### 1. *Jury Selection Plan*

The Jury Selection Plan adopted by the Article III judges in CDCA and approved by the Judicial Council of the Ninth Circuit governs the selection of grand and petit jury venires. *See* 28 U.S.C. § 1863(a); 28 U.S.C. § 132(b). The Clerk does not participate in the decision to approve or reject the Jury Selection Plan. (Clerk Opposition, at 1.) The Jury Selection Plan, in accordance with 28 U.S.C. § 1863(b)(2), requires the Southern Division to use voter registration lists to select the names of prospective jurors. (General Orders 99–08, 07–10, 11–08 § 4, Wilke Decl. Exs. A–C.) The Plan [13] provides that "[a] random selection of a fair cross section of the citizens residing in the counties of the Divisions of the District can be made from the lists of registered voters" in the Divisions. (General Order 11–08 § 4.) According to the Plan, "[t]o foster the policy and protect the rights secured by §§ 1861 and 1862 of the Act, it is not necessary to use sources other than the voter registration lists." [14] (*Id.*) The 2004 grand jury that indicted Rodriguez was selected under General Order 99–08, and the 2011 petit jury that convicted Rodriguez was selected under General Order 11–08. (Motion, at 4 n. 1.)

The Plan instructs the Clerk to send a questionnaire (a juror qualification form) to prospective jurors, whose names are drawn randomly from the voter registration lists. (General Order 11–08 § 8.) The questionnaire asks the prospective juror for her race and ethnicity. (*See* Sample Juror Questionnaire, Wilke Decl. Ex. P.) Question 10(b) specifically asks if the juror is Hispanic or Latino. (*Id.*) Any person eighteen-and-over who has resided for at least one year within the district is qualified to serve on a grand or petit jury unless she is unable to read, write, or understand English enough to satisfactorily complete the questionnaire; is unable to speak English; is incapable of performing jury service due to mental or physical in-

2005. (Government Opposition, at 28; Reply, at 9.)

12. ACS, 2007–2011 Sex by Age by Citizenship Status, Wilke Decl. Exs. K–O.

13. For present purposes, the General Orders are substantially the same except as noted.

14. In 2004, the Ninth Circuit Jury Trial Improvement Committee, focusing on state-wide data, found that voter registration lists underrepresent Hispanic citizen populations and overrepresent Caucasian populations. (Ninth Circuit Jury Trial Improvement Committee, First Report on Goals and Recommendations, Wilke Decl. Ex. R, at 8.) The Committee recommended supplementing the voter registration lists with drivers' license/identification lists from the Department of Motor Vehicles. (*Id.*) CDCA has not adopted these recommendations.

firmity; or has a pending felony charge or felony conviction. (General Order 11–08 § 9 (citing 28 U.S.C. § 1865(b).)). In 2009 and 2010, the Southern Division's master jury wheel source list—the list of names to be called as potential jurors—consisted of approximately 35,000 persons per year. (Jury Representation Memorandum, Wilke Decl. Ex. U.)

### 2. *Procedures in the Southern Division*

To monitor the Plan and ensure jurors are selected from a fair cross section of the community, the Clerk's Office generates a yearly JS12 Race Ethnicity Report that details the racial and ethnic composition of CDCA's jury pools and the juror-eligible population. (Clerk Opposition, at 2–3; *see, e.g.,* JS12 Race Ethnicity Reports, Wilke Decl. Ex. J; JS12 Race Ethnicity Reports, Wagstaffe Decl. Ex. J.) According to the Judicial Conference of the United States, courts should use age-eligible citizen data when generating such reports, not age-eligible general population data. (Report of the Proceedings of the Judicial Conference of the United States—March 13, 2002, Wagstaffe Decl. Ex. A, at 15.) The Administrative Office of the U.S. Courts ("AO") provides this data to the federal districts approximately every ten years in conjunction with the U.S. Census Bureau's reporting of decennial population figures. (Clerk Opposition, at 3; Judge Thomas F. Hogan, Memorandum re: 2010 Population Tables, Wagstaffe Decl. Ex. B, at 1.) The Clerk's Office received the 2010 data in March 2012, after Rodriguez filed this challenge. (*See* Hogan Memorandum, Wagstaffe Decl. Ex. B; Declaration of Terry Nafisi ("Nafisi Decl.") ¶ 3, Docket No. 1199–1.)

Before October 2011, the JS12 Race Ethnicity Reports issued by the Clerk for 2001–2010 relied on data from the 2000 Census and stated that Hispanics constituted 15.54% of Orange County's "general population." (*See* JS12 Race Ethnicity Reports, Wilke Decl. Ex. J; Nafisi Decl. ¶ 3.) In this context, "general population" referred to age-eligible citizens. (Nafisi Decl. ¶ 3; Motion, at 5 n. 3.)

After Rodriguez challenged the venire, the Clerk's Office comprehensively reviewed its jury selection procedures and instituted several changes. (Nafisi Decl. ¶ 7.) First, during the review, the Clerk's Office uncovered two errors in how its computer systems calculated the race and ethnicity of the jury pools: 1) multiple counting of deferred jurors, and 2) identifying all individuals who failed to answer the race/ethnicity question in the juror questionnaire as "Non–Hispanic" rather than "Unknown." (Motion, at 10–11; Jury Representation Memorandum, Wilke Decl. Ex. U, at 2; Jury Management Report (Automation Review)—October 14, 2011, Wagstaffe Decl. Ex. I.) Specifically, before October 2011, the Clerk determined the percentage of Hispanics in the jury pool by dividing the total number of persons who answered "yes" to being Hispanic or Latino on the juror questionnaire by the total number of processed questionnaires. (Motion, at 10.) Now, the Clerk determines the percentage by dividing the total number of persons who answer "yes" to being Hispanic or Latino by the total number of persons who respond to the question, thus not including persons who fail to respond in the calculation. (*Id.;* Jury Representation Memorandum, Wilke Decl. Ex. U, at 3.) Second, the Clerk's office began using the ACS age-eligible citizen data to generate revised JS12 Race Ethnicity Reports for 2007–2011. (*See* Nafisi Decl. ¶ 8; JS12 Race Ethnicity Reports, Wagstaffe Decl. Ex. J.)

### D. Proposed Disparity Calculations

The following tables present the parties' proposed disparity calculations. "Absolute

disparity" ("AD") is "the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool." *United States v. Rodriguez–Lara*, 421 F.3d 932, 943 (9th Cir.2005). "Comparative disparity" ("CD") is calculated by dividing the absolute disparity by the percentage of the distinctive group in the community. *Id.* at 943 n. 10.

### Table 4: Clerk's Original JS12 Race Ethnicity Report Disparity Calculations

| Year | AD Using Citizen (18+) Data (2000 Census Bureau) | CD Using Citizen (18+) Data |
|---|---|---|
| 2004 | 15.54 − 10.99 = 4.55% | 4.55 / 15.54 = 29.28% |
| 2005 | 15.54 − 10.34 = 5.20% | 5.20 / 15.54 = 33.46% |
| 2007 | 15.54 − 12.48 = 3.06% | 3.06 / 15.54 = 19.69% |
| 2008 | 15.54 − 11.52 = 4.02% | 4.02 / 15.54 = 25.87% |
| 2009 | 15.54 − 12.22 = 3.32% | 3.32 / 15.54 = 21.36% |
| 2010 | 15.54 − 15.19 (Jan–June) = .35% | .35 / 15.54 = 2.25% |

### Table 5: Rodriguez's Proposed Disparity Calculations [15]

| Year | AD Using General Population (18+) Data | CD Using General Population (18+) Data | AD Using Citizen (18+) Data (ACS) | CD Using Citizen (18+) Data (ACS) |
|---|---|---|---|---|
| 2004 | 26.4 (2000 Census) − 10.99 (2004 JS12) = 15.41% | 15.41 / 26.4 = 58.37% | N/A | N/A |
| 2005 | 26.4 (2000 Census) − 10.34 (2005 JS12) = 16.06% | 16.06 / 26.4 = 60.83% | N/A | N/A |
| 2007 | 28.72 (ACS) − 13.43 (2007 Jury Questionnaires) [16] = 15.29% | 15.29 / 28.72 = 53.24% | 18.39 − 13.43 = 4.96% | 4.96 / 18.39 = 26.97% |
| 2008 | 29.13 − 14.19 = 14.94% | 14.94 / 29.13 = 51.29% | 19.21 − 14.19 = 5.02% | 5.02 / 19.21 = 26.13% |
| 2009 | 29.56 − 13.42 = 16.14% | 16.14 / 29.56 = 54.60% | 20.67 − 13.42 = 7.25% | 7.25 / 20.67 = 35.07% |
| 2010 | 29.53 − 16.35 = 13.18% | 13.18 / 29.53 = 44.63% | 21.01 − 16.35 = 4.66% | 4.66 / 21.01 = 22.18% |

**15.** Declaration of Joseph W. Doherty ("Doherty Decl.") ¶¶ 8–13, Docket No. 1190.

**16.** For 2007–2011, Rodriguez calculates the absolute disparity by using the ACS data and data from the Summary of Processed Jury Questionnaires in the Southern Division from 2007–2011. (*See* Wilke Decl. Ex. Q; Doherty Decl. ¶¶ 9–13.) To tabulate the jury questionnaire data, Rodriguez first eliminates entries coded as failure to return or undeliverable to determine the "Total Processed Questionnaires." He next eliminates duplicate entries—two or more entries in which the juror number and name matched. Then, he totals the responses to Question 10(b)—Hispanic ethnicity. Rodriguez next matches the "Census List of Spanish Surnames" against the list of persons who failed to respond to Question 10(b) and adds that total to the Question 10(b) total to determine the purported total number of Hispanics and non-Hispanics in the pool of non-duplicative questionnaires. (Wilke Decl. ¶ 11.) Finally, Rodriguez divides that total by the number of non-duplicative questionnaires to determine the pool percentage.

| 2011 | 29.92 − 16.61 = **13.31%** | 13.31 / 29.92 = **45.57%** | 21.38 − 16.61 = **4.77%** | 4.77 / 21.38 = **22.31%** |

## Table 6: The Government's Proposed Disparity Calculations

| Year | Absolute Disparity Using Citizen (18+) Data (ACS) | Comparative Disparity Using Citizen (18+) Data |
|---|---|---|
| 2004 | 17.90 − 10.99 (2004 JS12) = **6.91%** [17] | 6.91 / 17.90 = **38.60%** |
| 2005 | 17.90 − 10.34 (2005 JS12) = **7.56%** | 7.56 / 17.90 = **42.23%** |
| 2007 | 18.39 − 17.60 (2007 Processed Questionnaires Report) = **.79%** [18] | .79 / 18.39 = **4.30%** |
| 2008 | 19.21 − 17.02 = **2.19%** | 2.19 / 19.21 = **11.40%** |
| 2009 | 20.67% − 16.02% = **4.65%** | 4.65 / 20.67 = **22.50%** |
| 2010 | 21.01% − 19.53% = **1.48%** | 1.48 / 21.01 = **7.04%** |
| 2011 | 21.01 (2010 ACS) − 19.70 (2011 PQs) = **1.31%** [19] | 1.31 / 21.01 = **6.24%** |
| | 21.38 − 19.70 (2011 PQs) = **1.68%** | 1.68 / 21.38 = **7.86%** |

## II. LEGAL STANDARDS

### A. Sixth Amendment and JSSA

■ The Sixth Amendment and the requirements codified in the JSSA, 28 U.S.C. §§ 1861–78, are coextensive and guarantee a criminal defendant the right to have a grand jury and petit jury drawn from a fair cross section of the community.[20] *United States v. Torres–Hernandez*, 447 F.3d 699, 703 (9th Cir.2006); *see also Taylor v. Louisiana*, 419 U.S. 522, 536, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The JSSA requires each district court to develop a jury selection plan, "specify whether the names of prospective jurors shall be

17. The Government uses the 2005 ACS data for age-eligible citizens for this calculation because no age-eligible citizen data is available for 2004. It argues that the 10.99% figure likely is higher because of the errors in the Clerk's system. (Government Opposition, at 28–29.)

18. For 2007–2011, the Government calculates the absolute disparity by using the revised Processed Questionnaire Reports. (*See* Wagstaffe Decl. Ex. J.) To tabulate the data, the Clerk uses the total number of processed questionnaires with duplicates removed. (There is a slight, insignificant disparity in the parties' numbers, *e.g.*, 17,800 non-duplicative questionnaires in 2007 per Rodriguez compared to 17,657 non-duplicative questionnaires in 2007 per the Clerk and the Government.) The Clerk next totals the responses to Question 10(b)—Hispanic ethnicity. The Clerk does not postulate as to ethnicity of those who failed to respond to Question 10(b) to the determine the total number of Hispanics in the pool of processed questionnaires, unlike Rodriguez. The Clerk then subtracts the questionnaires with unknown ethnicity from the total number of non-duplicative questionnaires. Finally, the Clerk divides the number of Hispanics by the number of non-duplicative questionnaires that answered the ethnicity question to determine the pool percentage, unlike Rodriguez. For instance, in 2007, of 17,657 non-duplicative questionnaires, the Clerk subtracted the 5352 that did not state an ethnicity for a total of 12,305. The Clerk then divided 2166—the number of self-identified Hispanics—by 12,305, for a percentage of 17.60%. (2007 Processed Questionnaires, Wagstaffe Decl. Ex. J, at 8.)

19. The Clerk originally used 2010 ACS Data because 2011 ACS Data was unavailable.

20. "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division," and "prescribe some other source or sources of names in addition to voter lists where necessary to foster ... and protect" this policy and right. 28 U.S.C. § 1863(b)(2).

 ██ To establish a prima facie case for a violation of the Sixth Amendment and JSSA fair cross section requirement, the defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.

447 F.3d at 703 (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). The defendant is not required to show the selection procedure is susceptible to abuse or not race-neutral, only that the exclusion of his or her group is "systematic." *Rodriguez–Lara*, 421 F.3d at 940. Once a defendant establishes a prima facie case, the burden shifts to the government to show that a significant state interest is " 'manifestly and primarily advanced by those aspects of the jury - selection process ... that result in the disproportionate exclusion of a distinctive group.' " *Id.* (quoting *Duren*, 439 U.S. at 367–68, 99 S.Ct. 664).

**B. Fifth Amendment Equal Protection Clause**

 ██ To establish a violation of the Fifth Amendment right to equal protection, "the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda v. Partida*, 430 U.S. 482, 494,

97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). To establish a prima facie equal protection claim, the defendant must (1) show the group is " 'a recognizable, distinct class, singled out for different treatment under the laws ...' "; (2) " 'prove the degree of underrepresentation, by comparing the proportion of the group in the total population to the proportion called to serve as ... jurors, over a significant period of time' "; and (3) show " 'a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.' " *Rodriguez–Lara*, 421 F.3d at 940 (quoting *Castaneda*, 430 U.S. at 494, 97 S.Ct. 1272). The Ninth Circuit rejects the proposition that "the mere susceptibility of a selection procedure to abuse, even where accompanied by evidence that a given group is substantially underrepresented on a single venire, establishes a prima facie case of intentional discrimination as a matter of law." *Hirst v. Gertzen*, 676 F.2d 1252, 1258 (9th Cir.1982). Once a defendant establishes a prima facie case, the burden shifts to the government to rebut the presumption " 'by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.' " *Rodriguez–Lara*, 421 F.3d at 940 (quoting *Castaneda*, 430 U.S. at 494, 97 S.Ct. 1272).

## III. *DISCUSSION*

### A. Timeliness of JSSA Challenge

The Government argues that Rodriguez's JSSA challenge is untimely under 28 U.S.C. § 1867(a). (Government Opposition, at 13–20.) As to the petit jury, the Court sees no reason to reconsider its previous holding that "Rodriguez acted diligently and within the time requirements of Section 1867(a)." (Order, Docket No. 1080, at 7.) Although the Court finds that Rodriguez's JSSA grand jury challenge is

untimely, Rodriguez may bring his motion separately on constitutional grounds, a position the Government does not dispute.[21] (*See* Government Opposition, at 13–20). The Court therefore addresses the constitutional claims.

■ Rodriguez all but admits in his Reply that he never investigated the Southern Division's grand jury practices before August 2011. Instead, he puts the burden of diligence on the Clerk, claiming that he could not have discovered the grounds for his motion earlier (1) from available JS12 Reports because (a) the original reports showed a 4.6% absolute disparity in 2004, (Wilke Decl. Ex. J–5), or (b) the original reports did not detail their methodology and relied on census data for the age-eligible citizen population that was then identified on the reports as the "general population," (Reply at 7–8); and (2) from ACS data publicly available since 2005 because it does not show Hispanic representation in the age-eligible citizen population in 2004, (*id.* at 9).

The Court finds this is not a credible explanation for why Rodriguez first complained about the 2004 grand jury in August 2011, particularly where the composition of a 2011 petit jury cannot necessarily indicate a deficiency in a grand jury seven years earlier. In *United States v. Bearden,* 659 F.2d 590, 597–98 (5th Cir. Unit B 1981), the court thought it was doubtful that the defendants had exercised diligence in investigating grand jury selection practices where they began "intensive[ly] investigat[ing]" the practices prior to the indictment, interviewed court employees, and reviewed documents in the clerk's office but did not explain why they did not attempt to question the jury clerk about potential improprieties. Rodriguez apparently undertook no such investigation before 2011, six years after his indictment and two years after the Clerk destroyed the 2004 questionnaires pursuant to the document retention practices.[22] (*See* Stolper Decl. ¶ 3.)

Rodriguez's claim that he would not have been on notice even if he had previously seen the original JS12 Race Ethnicity Reports is not well-taken. His motion in 2011 was founded on population statistics and his belief that using the voter registration lists alone is improper; it does not even mention the Clerk's data. (*See* Motion to Strike Venire, Docket No. 1073, at 9–10.) Further, many of his current arguments rest on a disbelief in the credibility of the Clerk's representations and methodology in the original and revised

---

**21.** 28 U.S.C. § 1867(e) provides:
The procedures prescribed by this section shall be exclusive means by which a person accused of a Federal crime ... may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title. Nothing in this section shall preclude any person or the United States from pursuing any other remedy, civil or criminal, which may be available for the vindication or enforcement ·of any law prohibiting discrimination on account of race, color, religion, sex, national origin, or economic status in the selection of persons for service on grand or petit juries.
The Ninth Circuit has not spoken clearly on whether the failure to comply with § 1867's procedural requirements bars a constitutional challenge to a jury selection procedure. *See Paige v. United States,* 493 F.2d 22, 23 (9th Cir.1974) (holding that attack on grand and petit jury selection process was time-barred under Jury Selection and Tenure Act of 1968 ("JSTA"), 28 U.S.C. § 1867(a), although defendant argued that use of voter lists discriminates against those groups, making JSTA unconstitutional and § 1867(a) inapplicable). The Government does not claim the constitutional challenges are time-barred, so it is unnecessary to address this question.

**22.** It now is impossible to ascertain the composition of the 2004 jury venire, which is problematic given the Clerk's errors in calculating the percentage of Hispanics in the jury wheel.

JS12 Reports. (*See generally* Motion.) Rodriguez has not adequately explained why he could not or would not have questioned the propriety of the absolute disparity calculations or pointed out defects in the Southern Division's Jury Selection Plan in 2007, especially when General Order 99–08, comparable U.S. Census Bureau data for 2000 and ACS data for 2005, and the Ninth Circuit Jury Trial Improvement Committee's Report were matters of public record before 2007. Even assuming Rodriguez attempted some investigation, there is no evidence that he was "misled or that needed information was withheld from [him]." *United States v. Geelan*, 509 F.2d 737, 740 (8th Cir.1974). Rodriguez therefore had ample opportunity to discover the facts underlying his grand jury challenge by the exercise of diligence, and his motion is untimely under 28 U.S.C. § 1867(a). *See United States v. Layton*, 519 F.Supp. 946, 953 (N.D.Cal.1981) (holding statutory challenge under JSSA untimely where facts underlying challenge, including alleged defects in jury selection plan, were matters of public record or discoverable by exercise of diligence); *United States v. Arnett*, 342 F.Supp. 1255, 1258 (D.Mass. 1970) (holding grand jury challenge statutorily barred because grand jury returned indictment on September 10, 1970, and defendant could have discovered alleged defects in its constitution by looking at jury selection plan but did not move to dismiss until October 19, 1970).

### B. Sixth Amendment and JSSA Fair Cross Section Challenge ·

Hispanics are a distinctive group under the first prong of *Duren*. *Hernandez–Estrada*, 704 F.3d at 1020–21. Thus, only the second and third prongs of *Duren* are disputed. Rodriguez maintains that he does not have to submit data for the age-eligible citizen population to make a prima facie fair cross section or equal protection claim and that the Court should account for prospective jurors who failed to establish their ethnicity by using surnames to identify Hispanic ethnicity. (Reply, at 9, 14). The Government contends that the Court must only consider the age-eligible citizen population data, because it best approximates the percentage of jury-eligible Hispanics in the Southern Division, and disregard prospective jurors who did not establish their ethnicity. (Government Opposition, at 21–27.)

 To analyze the second prong of *Duren,* which typically requires proof in the form of statistical data, the Ninth Circuit only uses the "absolute disparity" test.[23] *Hernandez–Estrada*, 704 F.3d at 1020–21 (citations omitted). "[A] disparity of 7.7% is acceptable." *Id.* (citing *Rodriguez–Lara*, 421 F.3d at 943–44). The Ninth Circuit is clear as to the preferred statistical data: "[T]o prove Hispanics are underrepresented in a given district's jury pools, the *ultimate* basis for comparison is the district's *actual percentage of jury-eligible* Hispanics." *Torres–Hernandez*, 447 F.3d at 703–04 (emphasis added) (citing *Esquivel*, 88 F.3d at 727). When evaluating challenges to a jury pool, the "district court need not *and may not* take into account Hispanics who are ineligible for jury service." *Id.* at 701 (emphasis added). Instead, when the parties present various types of data, to determine whether Hispanics are underrepresented the district court *"must* rely on the statistical data that *best approximates* " or *"most accurately reflects* " "the percentage of jury-eligible Hispanics in the district."[24]

---

**23.** Rodriguez devotes substantial time to make his case that there are other, better measures than the Ninth Circuit's absolute disparity test. It is not this Court's role to make this judgment given the Ninth Circuit's clear holdings.

**24.** *Torres–Hernandez* therefore mostly reconciled the conflict between *Rodriguez–Lara,*

*Id.* at 701, 704 (emphasis added). This is true even if jury-eligible data does not consider each factor for jury eligibility, *e.g.*, English proficiency or residence.[25] *See id.* at 705 n. 8 ("[A] defendant may not 'selectively include data which supports her position, while ignoring census data which … also bears on the issue of disparity.' Thus, it would be objectionable for a defendant to submit age-eligible data if the data source also included other jury-eligible factors such as citizenship or English proficiency." (quoting *Esquivel*, 88 F.3d at 727 n. 2) (citation omitted)).

■ The court must then compare the percentage of jury-eligible Hispanics to the percentage of Hispanics in the jury wheel. To determine the percentage of Hispanics in the jury wheel, the district court should "exclude those who did not identify their ethnicity on the questionnaire." *Hernandez–Estrada*, 704 F.3d at 1020–21 (citing *Rodriguez–Lara*, 421 F.3d at 944 n. 11.) This approach "avoid[s] distorting the numbers." 421 F.3d at 944 n. 11. In contrast, Rodriguez's approach "unrealistically assume[s] that none of the jurors not reporting their ethnicity," *id.*, *and* lacking a Spanish surname were Hispanic. The court's "calculations [should] reflect no assumptions about the ethnicity of those not reporting." *Id.* Therefore, although Rodriguez disagrees and believes his data set is more "refined," the Court must, because the data allows, follow the Clerk's and Government's approach and exclude prospective jurors with unreported ethnicity from the disparity analysis.[26]

■ As to the petit jury, the proper absolute disparity calculation is the Government's—Table 6. Therefore, Hispanics were underrepresented by 1.68% in 2011. If the Court looked to Rodriguez's jury wheel methodology, Hispanics were underrepresented by 4.77%. As Rodriguez concedes, the data does not demonstrate that Hispanic citizens were constitutionally (or statutorily) underrepresented in the Southern District's petit jury venire in 2010–2011.[27] *See Hernandez–Estrada*, 704 F.3d at 1024–25 (holding 1.7% and 6.2% absolute disparities constitutionally insignificant). Thus, the petit jury challenge is rejected.

■ As to the grand jury, the precise absolute disparity is unknown because there is no available jury-eligible Hispanic citizens data or revised jury pool composition data for 2004. Rodriguez supports using the 2000 U.S. Census Bureau Hispanic general population data and the original 2004 JS12 Race Ethnicity Report to find a 15.41% absolute disparity, which would be constitutionally significant. *See Rodriguez–Lara*, 421 F.3d at 944 (finding

421 F.3d at 941–44, where the court held that the defendant could proffer evidence of the overall percentage of Hispanics, or age-eligible Hispanics, in the district to satisfy *Duren* and not data reflecting the jury-eligible population, and *United States v. Artero*, 121 F.3d 1256, 1261 (9th Cir.1997), where the court held that the defendant must proffer jury-eligible statistical evidence.

**25.** Although Rodriguez implies that the data in *Torres–Hernandez* considered English proficiency and residency, that is not established by the opinion's citation to 28 U.S.C. § 1865(b).

**26.** Moreover, the Court can state from its own experience at the third trial, particularly voir dire, that there were jurors with Hispanic surnames who were not ostensibly Hispanic, and jurors with non-Hispanic surnames who were ostensibly Hispanic.

**27.** Rodriguez's expert opines that many of the disparities Rodriguez points to are "statistically significant to a high degree and, therefore, cannot be attributed to random chance." (*See, e.g.,* Doherty Decl. ¶ 7–13.) Even if some of the disparities may be statistically significant, they fall below the disparities the Ninth Circuit considers *constitutionally* significant.

14.6% absolute disparity between age-eligible population and jury wheel significant). The Government advocates using the 2005 ACS Data and the original 2004 JS12 Report to find an insignificant 6.91% absolute disparity. Rodriguez claims this disparity is significant because the 7.7% threshold established in *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir.1982) is based on general population data. (Reply, at 12–13.)

▇ The Court finds that Government's proposal "best approximates the percentage of jury-eligible Hispanics in the district" and accordingly adopts it. *Torres–Hernandez*, 447 F.3d at 704. U.S. Census Bureau data shows that Hispanics constituted 26.4% of Orange County's eighteen-and-over general population in 2000. ACS data shows that the percentage of eighteen-and-over Hispanic citizens in Orange County increased from 17.90% to 21.38% between 2005 and 2011. This is 5% less than the eighteen-and-over general population in 2000, and no evidence suggests that the percentage of Hispanic citizens in Orange County decreased from 2004 to 2005. Hence, it would be inconsistent and contrary to the guidance in *Torres–Hernandez* to rely on the ACS jury-eligible data to analyze venires post–2004 while simultaneously only using the U.S. Census Bureau's age-eligible data from 2000 for the grand jury challenge. Accordingly, because the absolute disparity in 2004 was at most 6.91% (and recognizing that Hispanics probably comprised less

than 17.90% of the jury-eligible population in the Southern Division in 2004), the data does not demonstrate that Hispanics were constitutionally (or statutorily) underrepresented in the grand jury venire in 2004. *See Hernandez–Estrada* 704 F.3d at 1024–25 (holding that 6.2% absolute disparity between Hispanics in jury pool and jury-eligible citizen population did not clear 7.7% threshold).[28] Thus, the grand jury challenge is rejected.

Accordingly, the Court **DENIES** Rodriguez's motion to dismiss his indictment or grant a new trial under the Sixth Amendment and JSSA.

### C. Fifth Amendment Equal Protection Challenge

Rodriguez argues that the *Castaneda* test is met because 1) Hispanics are a distinct class; 2) the statistical disparities he presents demonstrate substantial underrepresentation of Hispanics in the jury wheel; 3) CDCA relies only on registered voter lists despite state-wide evidence that the lists underrepresent Hispanics; and 4) the jury selection procedure is "susceptible of abuse" or "not racially neutral." (Motion, at 23–29; Reply, at 13–18.) The Government counters that Rodriguez fails to show substantial underrepresentation under the Ninth Circuit's standards or any other evidence that the Clerk purposefully concealed data and discriminated against Hispanics. (Government Opposition, at 32–35.)

---

**28.** The reasoning in *Hernandez–Estrada* renders Rodriguez's argument that the 7.7% threshold is only for general population data unavailing. Further, as the Government notes, the Ninth Circuit has looked to the "absolute numerical composition of the grand jury" to determine the substantiality of the deviation. *United States v. Armstrong*, 621 F.2d 951, 955–56 (9th Cir.1980) (citing *United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir.1977)); *see Suttiswad*, 696 F.2d at 649

("[T]o determine substantiality [in the grand jury context] we look to *people* not *percentages*."). In a grand jury of 23 people, a 6.91% disparity translates to 1.59 fewer Hispanics, a disparity "similar to those previously approved" by the Ninth Circuit that "may be considered insubstantial." *Suttiswad*, 696 F.2d at 649 (finding that 1.761 fewer Hispanics persons on grand jury is not substantial disparity).

Although Hispanics are a distinct class, Rodriguez does not show they are "singled out for different treatment under the laws, as written or as applied." *Esquivel*, 88 F.3d at 727 (quoting *Castaneda*, 430 U.S. at 494, 97 S.Ct. 1272). The Court has concluded that the absolute disparities in the Southern Division of 6.91% in 2004 (with its imperfect data) and 1.68% in 2011 are not constitutionally significant. *See infra* § III.B. From 2007–2011, the years for which ACS and corrected jury wheel data is available, the absolute disparities ranged from a low of .79% to a high of 4.65%. Even assuming the statistical showing for an equal protection claim falls below that required for a fair cross section claim, *see United States v. Sanchez–Lopez*, 879 F.2d 541, 548 (9th Cir.1989) (discussing *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), and finding existence of intentional discrimination to be determinative, distinguishing fact), these disparities are below those the Ninth Circuit has considered significant for an equal protection violation. *E.g., Esquivel*, 88 F.3d at 727 (finding 4.9% absolute disparity based on jury-eligible population and concluding that defendant presented no evidence Hispanics were singled out). Thus, the disparities are not sufficiently large such that "it is unlikely that [they are] due solely to chance or accident." *Castaneda*, 430 U.S. at 494 n. 13, 97 S.Ct. 1272.

More importantly, Rodriguez fails to demonstrate that the Southern Division's jury selection procedure is susceptible of abuse or not racially neutral, or any other discriminatory intent on the part of the Clerk. The existence of a subjective selection system for selecting potential grand or petit jurors may, together with other evidence, support a prima facie showing of discriminatory purpose made out by the use of statistics. *See Hillery v. Pulley*, 563 F.Supp. 1228, 1248 (E.D.Cal. 1983), *aff'd* 733 F.2d 644 (9th Cir.1984),

*aff'd sub nom. Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (citing *Castaneda*, 430 U.S. at 497, 97 S.Ct. 1272; *Turner v. Fouche*, 396 U.S. 346, 360, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970)). In *Castaneda*, the Supreme Court held that the petitioner established a prima facie equal protection violation because the selection method, the "key-man" system, allowed jury commissioners to personally select between fifteen and twenty citizens from the community to be members of the jury pool, which made the method "highly subjective" and susceptible of abuse. 430 U.S. at 484, 497, 97 S.Ct. 1272; *see Esquivel*, 88 F.3d at 727. In *Alexander v. Louisiana*, 405 U.S. 625, 627, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), jury commissioners compiled a list of names from sources including telephone and city directories, voter registration lists, and lists compiled by the jury commissioners. Questionnaires sent to persons on the list asked about race, and once a questionnaire was returned, the commissioners would attach a card designating, *inter alia*, the potential juror's race. *Id.* at 628, 92 S.Ct. 1221. The Supreme Court found that "[t]he racial designation on the questionnaires and information cards provided a clear and easy opportunity for racial discrimination." *Id.* at 630, 92 S.Ct. 1221.

In *Hillery*, 563 F.Supp. at 1232, the court found that no black person had served on the county grand jury from 1893–1962. During the seven years before the defendant's indictment, the state judge who picked the grand juries had never selected a black person, although he claimed it was not for discriminatory reasons. *Id.* at 1233. Statistical analysis indicated a high improbability that something other than discrimination resulted in no black person sitting on a grand jury for those seven years, and the court emphasized "the highly subjective nature of the grand jury selection system." *Id.* at 1241,

1248. In *Esquivel,* the Ninth Circuit rejected the contention that any substantial disparity over a period of time between a group's percentage on the jury and its percentage in the eligible population is prima facie evidence of discrimination, regardless of the source of jurors. 88 F.3d at 728. The court reasoned that in *Turner,* 396 U.S. at 360, 90 S.Ct. 532, the Supreme Court "determined that although the jury commissioners utilized the voter list as the original source for compiling the jury pool, the commissioners invoked their subjective judgment rather than objective criteria in the selection process of the actual jury pool." 88 F.3d at 728. The Ninth Circuit accordingly held that the Southern District of California's jury selection method of randomly selecting from voter registration list, as prescribed by the JSSA, did not involve subjective judgment. *Id.*

The JSSA requires district courts to supplement the voter registration lists with other sources of names if necessary to achieve a fair cross section of the community. 28 U.S.C. § 1863(b)(2). As in *Esquivel,* the random selection of the Southern Division's master jury wheel from these lists is objective and wholly distinguishable from the subjective methods, or methods susceptible to subjective judgments, criticized in *Castaneda, Alexander,* and *Hillery.* The random selection treats Hispanics the same as Caucasians, blacks, Asians, and other groups. Nor do the

Clerk's other actions establish a prima facie case of intentional discrimination that can "be inferred from the totality of relevant circumstances." *Hirst,* 676 F.2d at 1260. The Clerk's decisions to use ACS instead of Census Bureau data—which the original JS12 Race Ethnicity Reports indicate was age-eligible citizen data—and change the methodology for calculating Hispanic representation in the jury wheel do not demonstrate purposeful concealment. Rather, the decisions comport with the Ninth Circuit's recommendations for jury selection procedures and disparity calculations in *Rodriguez–Lara, Torres–Hernandez,* and *Hernandez–Estrada,* and have improved the accuracy and usefulness of the JS12 Race Ethnicity Reports.[29] (*See* Nafisi Decl. ¶¶ 7–8; Jury Representation Memorandum, Ex. U.) Rodriguez's emphasis on California-wide voter registration statistics also is misplaced, because the relevant community is Orange County. The best evidence available indicates that 84.79% of eighteen-and-over citizens in Orange County were registered in 2009, and 85.31% were registered in 2010. (*See* Jury Representation Memorandum, Wilke Decl. Ex. U.) Assuming that data is correct, this exceeds the state-wide numbers by a significant degree, exceeds the American Bar Association's standard of at least 80% for source list coverage, and meets the National Center for State Courts' standard of at least 85%. (Ninth Circuit Jury

---

**29.** In his Reply, Rodriguez claims that the Clerk's failure to file reports on jury selection with the AO, the lack of written policies or procedures prior to Rodriguez's challenge, and the JS12 Reports' failure to disclose the data on which they were based purposefully concealed disparities. The Court need not consider these arguments because Rodriguez did not raise them in his moving papers and so the Government and the Clerk have not had an adequate opportunity to respond. *See, e.g., United States v. Bohn,* 956 F.2d 208, 209 (9th Cir.1992) (noting that courts generally decline to consider arguments raised for first

time in reply brief). Even so, the citizenship data the original and corrected JS12 Reports relied upon is publicly available, and the Clerk has not concealed the methodology (or any errors) from Rodriguez or the Court. There is no reason to believe that any technical failure to maintain jury selection reports stemmed from invidious discrimination or a desire to conceal a problematic disparity, especially when Rodriguez made no effort to obtain information from the Clerk before August 2011. Thus, this evidence does not support a finding of intentional discrimination.

Trial Improvement Committee, First Report on Goals and Recommendations, Wilke Decl. Ex. R, at 8.) Thus, it does not necessarily follow that the state-wide statistics must have placed the Clerk on notice of a substantial underrepresentation in Orange County, or that the Court should infer purposeful discrimination from the Clerk's failure to use data from the Department of Motor Vehicles to supplement the voter registration lists.

Therefore, the Court finds that Rodriguez fails to establish a prima facie case of intentional discrimination based on statistical evidence, the jury selection procedure in the Southern Division, and the totality of the circumstances. Accordingly, the Court **DENIES** Rodriguez's motion to dismiss the indictment or grant a new trial under the Fifth Amendment's Equal Protection Clause.

**D. Request for Discovery**

The Court previously concluded that "[t]o the extent any discovery request is predicated on alleged Fifth and Sixth Amendment violations," under *Rodriguez–Lara*, 421 F.3d at 947, "Rodriguez must show the disparity element prior to receiving discovery on other matters beyond that." (Order Modifying Scope of Discovery, Docket No. 1082, at 13.) The Court has found no actionable Fifth or Sixth Amendment or JSSA claims or statistical evidence of a constitutionally significant absolute disparity, and the evidence does not establish the likelihood of a prima facie case. Therefore, the circumstances do not warrant additional discovery on the fair cross section or equal protection claims. *Accord United States v. Cerna*, No. CR 08–0730 WHA, 2009 WL 2998930, at *3 (N.D.Cal. Sept. 16, 2009) (citing *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 221, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)) ("It is true that defendants may be permitted to inspect the records of past grand juries in preparation of a constitutional claim, but first they must present some evidence tending to show the existence of the essential elements of their challenge.").

Accordingly, the Court **DENIES** Rodriguez's request for additional discovery and an evidentiary hearing.

## IV. *CONCLUSION AND AFTERWORD*

For the foregoing reasons, the Court **DENIES** Rodriguez's motion to dismiss the indictment or grant a new trial for violation of the Sixth Amendment and JSSA's fair cross section requirement and/or violation of the Fifth Amendment's Equal Protection Clause, and **DENIES** Rodriguez's motion for discovery.

The concept of a trial by one's peers is a key constitutional protection and fundamental to the public's trust in the jury trial system in criminal cases. Thus, the extended analysis which both Rodriguez and the Government have developed over many months is plainly warranted. On the extensive record before the Court, the Court finds that Rodriguez received a trial by his peers at both the grand jury and petit jury stages. He was denied neither his constitutional nor statutory rights.

IT IS SO ORDERED.